WILLIAM G. E. SEE, receiver of the Columbia Straw Paper Company,

*v.*

WILLIAM C. HEPPENHEIMER, SAMUEL UNTERMEYER et al.

[Decided April 3d, 1905.]

1. Neither the good will of the promoters of a corporation, organized for the consolidation of various industrial plants, nor that transferred as a part of the plants consolidated, constitutes property for which stock of the consolidated corporation can be issued.

2. The directors of such consolidated corporation are not entitled, as against creditors, to issue stock in payment for property transferred to the corporation at a value based on a capitalization of contemplated profits.

3. Defendants promoted a corporation to consolidate various industrial plants, for which they paid $2,250,000, which were transferred to the corporation to sustain an issue of $1,000,000 bonds, secured by first mortgages on the properties, and $3,000,000 of common and preferred stock, which was issued as a bonus to purchasers of the bonds to the extent of $600 stock for each $1,000 of bonds purchased; the $1,000,000 raised by the sales of the bonds to be applied $750,000 to the purchase of the mills, $50,000 to the promoters' attorneys for legal services and expenses, and $200,000 to working capital. These bonds were sold largely under a prospectus headed, "Confidential, for private circulation only," which stated the proposed corporation to have $4,000,000 of stock, ten thousand shares at eight per cent. preferred and thirty thousand shares of common, closing with the words, "the vendors and their friends retain $800,000 of the preference stock and $2,600,000 of the common stock," and that $1,000,000 in cash was to be raised by bonds secured by mortgage, of which $750,000 was to be paid the vendors, "being about one-third of the appraised value of the property."—*Held*, that the stock of the corporation was issued at an inflated valuation and not in good faith for a property actually delivered, as required by *1 Gen. Stat. p. 952 § 213.*

4. A holder with notice of unpaid stock of a corporation is liable thereon to creditors, regardless of whether he subscribed for it or not, if the capital paid in is insufficient to satisfy their claims.

5. Where promoters of a consolidated corporation secured options on the plants to be consolidated, which recited the organization of a corporation having a stock liability of $4,000,000 and a mortgage debt of $1,000,000, and that the owners of the mills agreed to convey to the promoters or to the corporation the property described, and the good will

of their business, &c., in consideration of a payment of so much in cash, so much in preferred stock and so much in common stock of the consolidated corporation, &c., such option did not authorize the issue of all the stock of the consolidated corporation as fully paid, without regard to the number and value, in the aggregate, of the plants purchased.

6. Promoters of a corporation are bound to the exercise of good faith toward all the stockholders, and, having secured options on property intended to be conveyed to the corporation promoted, are bound to disclose to an independent board of directors all the facts relating to the property, the advisability of its purchase, the price paid therefor by the promoters, &c.

7. On the insolvency of a corporation the chancery court has jurisdiction of a bill by its receiver to recover liabilities of stockholders for unpaid stock necessary for the payment of debts, though the corporation's creditors have not recovered judgments within the state and had executions returned unsatisfied.

8. Where, in a suit by the receiver of an insolvent corporation to recover on stockholders' liabilities for unpaid stock, non-resident stockholders having no property in New Jersey appeared and litigated the question of their liability, they thereby submitted themselves to the jurisdiction of the court, and are subject to a decree, though recourse to the courts of the state of their residence may be required in order to enforce the same.

9. In such suit the stockholders are not entitled to set off claims against the corporation on bonds issued by it which have not been filed as claims against the corporation, and which are barred by the decree barring creditors.

10. The liability of such stockholders is analogous to that of joint guarantors in that those who are solvent and within the jurisdiction of the court can properly be charged with the entire burden, regardless of the liability of others, and they in turn are entitled to recover contribution from the others.

11. In the absence of proof to the contrary, creditors of a corporation are presumed to act on the information contained in the records relating thereto in the office of the secretary of state.

1' A purchase of bonds of a corporation, under an agreement that for each $1,000 in cash subscribed, a mortgage bond for $1,000 and a bonus of $600 of stock in the company in process of formation should be delivered, is sufficient to put such purchaser on inquiry that the stock so issued had not been paid for, either in cash or in its equivalent in property, and he is liable to creditors thereon.

13. In such a suit the amount necessary to be raised should be computed by ascertaining the amount due on the several claims allowed and proved, with interest, plus the fees of solicitors for the creditors in a proceeding to wind up the corporation and in the action to recover against the stockholders, plus a reasonable counsel fee and compensation to the receiver, and expenses incurred in the enforcement of the decree against the stockholders.

On final hearing on bill, answers and proofs.

The bill in this cause was filed in August, 1896, and was met with a demurrer which was overruled on the 29th of March, 1897, for reasons reported in *See* v. *Heppenheimer, 55 N. J. Eq. (10 Dick.) 240.*

The order overruling the demurrer was reviewed by the court of errors and appeals and affirmed February 28th, 1898, "for the reasons given in the court of chancery," *sub nom. Naumberg* v. *See, 56 N. J. Eq. (11 Dick.) 453.*

An amended bill was filed May 27th, 1898, and answers filed by fifteen of the defendants at dates varying from July 15th to September 20th, 1898.

The cause was elaborately argued in the summer of 1904 both orally, and later in print, the latter covering six hundred pages, by—

*Mr. Edward M. Colie* and *Mr. John DeWitt Warner* (of the New York bar), for the complainant.

*Mr. William H. Corbin,* for the defendants Edward J. Hall, estate of Otto Huber (who died after answer filed), William C. Heppenheimer and Thomas T. Ramsdell.

*Mr. Richard V. Lindabury* and *Mr. Louis T. Marshall* (of the New York bar), for the defendants, who joined in one answer, viz., Aaron Naumberg, William Kraus, William Lummis, Theodore L. Herrmann, Emanuel Lauer, Randolph Guggenheimer, Moses Weinman, Samuel, Isaac and Morris Untermeyer.

*Mr. Albert Chandler Wall,* for the defendant R. T. Spencer.

PITNEY, V. C.

The questions involved in this cause are important, both on account of their intrinsic character and of the amount—over $200,000—involved. They have been argued on each side by distinguished counsel, in the most able, thorough, exhaustive and

lucid manner, so that it is but simple truth to say that if the court, in dealing with the case, shall fall into any error, it will not be due in the least degree to a lack of illuminating instruction from counsel.

The suit is brought by the creditors, represented by the receiver in insolvency, of the Columbia Straw Paper Company, a corporation organized in this state in the month of December, 1892, and thrown into insolvency in May, 1895.

The object of the suit is to hold responsible certain of the stockholders of the company for the debts of the creditors. Of those stockholders sought to be charged only a comparatively few in number were served with process and brought within the jurisdiction of the court or appeared, but those few were and are holders of a very large portion of the stock of the insolvent corporation.

Those who were not served were duly proceeded against as absent defendants and a decree *pro confesso* taken against them, and hence they are bound by the result of these proceedings so far as such defendants can be bound in a cause like this.

The case against four of the defendants may be disposed of at once and briefly.

No case was made against Ramsdell, and the bill, as to him, must be dismissed, with costs, to be paid by the receiver out of the funds of the estate, if any, which come to his hands.

The case against Moore and Atwood was abandoned by consent, and the bill may be dismissed as against them, without costs.

The answers of Heingartner and Silk were peculiar. They claimed to be stockholders for value without notice, and joined in the prayer for relief in the bill against the other defendants. They did not appear at the hearing and no proof was made against them, and the bill may be dismissed as against them, without costs and without prejudice as to the rights of any other stockholders.

The ground on which the defendants are sought to be held is that the stock held by them was issued without any value paid for it, and hence that they occupy the position of subscribers to the capital stock who have not paid their subscrip-

tions, and therefore are liable to the creditors both at common law and under our statute.

*First.* At common law, on the familiar ground that unpaid subscriptions to capital stock form a trust fund for the benefit of creditors.

*Second.* And under the fifth section of the act concerning corporations of 1875 (*1 Gen. Stat. p. 910*), which declares that

"where the whole capital of a corporation shall not have been paid in, and the capital paid shall be insufficient to satisfy the claims of its creditors, each stockholder shall be bound to pay on each share held by him the sum necessary to complete the amount of such share as fixed by the charter of the company, or such proportion of that sum as shall be required to satisfy the debts of the company."

The charge of the complainant is that the stock so issued was not issued for cash, but for property purchased at an overvaluation, which overvaluation was arrived at by including in that valuation matters not in any sense property, and that this was done consciously and fraudulently.

The defences of the defendants are not all precisely similar. Those represented by Mr. Corbin claim to stand on a different footing from the others—that is, to have a defence somewhat peculiar to themselves—and they will be so considered.

The stress of the case is found in the defence set up by the defendants represented by Messrs. Lindabury and Marshall.

Counsel for those defendants, whom I shall hereafter call "the defendants," do not contend that the stock held by their clients was issued for cash paid, as required by the fifty-fourth section of the Corporation act (*1 Gen. Stat. p. 917*), but they claim that it was issued for property purchased at the value thereof, under the fifty-fifth section of that act, as amended by the act of May 9th, 1889. *1 Gen. Stat. p. 952 § 213.* For convenience, I insert here the language of the two sections covering this subject:

"54. That nothing but money shall be considered as payment of any part of the capital stock of any company organized under this act, except as hereinafter provided for the purchase of property, and no loan of money shall be made to a stockholder or officer therein; and if any such loan shall be made to a stockholder or officer of the company, the officers who shall make it, or who shall assent thereto, shall be jointly and severally liable, to the extent of such loan and interest, for all the debts of the company contracted before the repayment of the sum so loaned."

"213. That the directors of any company incorporated under this act may purchase mines, manufactories or *other property necessary for their business,* or the stock of any company or companies owning, mining. manufacturing or producing materials or other property necessary for their business, and issue stock to the amount of the value thereof in payment therefor. and the stock so issued shall be declared and be taken to be full paid stock and not liable to any further call, neither shall the holder thereof be liable for any further payments under any of the provisions of this act: and said stock shall have legibly stamped upon the face thereof 'issued for property purchased,' and in all statements and reports of the company to be published' this stock shall not be stated or reported as being issued for cash paid into the company, but shall be reported in this respect according to the' fact."

These defendants assert that the corporation, after being duly organized, purchased from one Emanuel Stein, of Chicago, thirty-nine different mills or plants, for the manufacture of straw paper, located in several of the western states, at the round sum and price of $5,000,000, for which it issued to Stein $1,000,000 of its bonds, secured by a first mortgage on the properties in question, and $1,000,000 of its preferred stock, and $3,000,000 of its common stock, and that their several holdings of stock are parcels of the stock so issued.

To this the creditors reply that there was no such actual purchase and sale from Stein to the corporation; that Stein was a mere figure-head for himself and one Beard and the defendant Samuel Untermeyer, and that Stein held for himself and the two just named options from the owners of the thirty-nine mills to purchase their mills at an aggregate price stated at $2,250,000, but actually footing up at less than $2,200,000, and that the mills were paid for on that basis, the owners receiving therefor in round figures, and with certain variations not now necessary to be given in detail, $750,000 in cash, $750,000 in preferred stock of the company and $1,500,000 of the common stock at fifty cents on the dollar, which would make $3,000,000. In actually working out the scheme, however, it is asserted and proved that the amount actually paid, counting the common stock at par, was less than $2,800,000, and that the balance of the stock of over $1,000,000 was divided equally between Stein, Beard and the defendant Samuel Untermeyer, without payment therefor.

Further, that the cash so paid was raised by selling the mortgage bonds at par, with two shares of preferred stock and four shares of common stock added as a bonus to each $1,000 bond.

The clients of Messrs. Lindabury and Marshall, as I interpret their argument, do not seriously dispute the accuracy of the statement just made, but they contend that the valuation of $5,000,000 was arrived at after a careful calculation of the quantity of paper, viz., ninety thousand tons, which the thirty-nine mills were able to produce per year, and the greatly increased price which would be realized from its sale by the suppression of the competition theretofore practiced between the several mill-owners. They say that the cost of producing the paper was less than $20 per ton and that its selling price had been reduced by competition to a trifle over $20 per ton, but that by a concentration of the ownership of the mills they found and believed that the price could be easily maintained and the whole product of ninety thousand tons a year could be marketed at about $28 per ton, which would pay interest on the bonded debt, with one per centum per year for a sinking fund, and a dividend at eight per cent. per year on the preferred stock of $1,000,000, and leave a very large dividend, at least fifteen per cent. each year, for the common stock of the amount mentioned, $3,000,000.

In short, they estimated the value of the property upon a capitalization of the profits expected to be made out of its use by control of the price of its product. So that, taking the aspect of the case most favorable to the defendants, the question which arises out of its ultimate analysis is, whether, under our statute above cited, it is competent and lawful to make up the valuation of the visible property to be purchased for stock issued, by adding to the actual market value, or cost of its reproduction, a sum of money ascertained by the capitalization of the annual profits expected to be realized from a favorable marketing of the product of the company by a suppression of competition. Or, as I believe I asked counsel in argument, can prospective profits, however promising, be considered as *property,* as that word is used in the statute above quoted?

. I repeat its language, "the directors of any company incorporated under this act may purchase mines, manufactories or

*other property* necessary for their business   *   *   *   and issue stock to the amount of the *value thereof* in payment therefor."

There the word *"property"* must evidently be construed by its context which refers to something visible and tangible, and necessary for the business, and the amount of stock to be issued therefor is limited to the *value thereof,* that is, to the value of that *property.*

. If the question above put be the true one it seems to me that it answers itself, and adversely to the contention of counsel of defendants.

But the defendants attempt to sustain their valuation in question on two grounds:

*First.* That the valuation was made in perfectly good faith and without any fraudulent intent; and that fraud is, by the rule to be applied here, a necessary ingredient of overvaluation; and

*Second.* That the increased valuation in this case may be justified by, and attributed to, the item of *"good will."*

The reply of counsel for complainant to the point of good faith and absence of fraud is twofold.

*First.* That these elements have no place in a transaction of this kind where the thing valued is not, properly speaking, property; and

*Second.* That the good faith and absence of fraud set up by the defendants will not stand the test of close scrutiny, and, further, that the circumstances of the case, given with great detail in the evidence, show that there was no actual appraisement of the property by a competent board of directors such as is contemplated by the statute.

With regard to the defence based on the item of good will, advanced by the defendants, complainant replies, that it is an' entire misapplication of the term, and all the law growing out of it, ·to use it in that connection, and they point out that the conveyances, and the contract preceding them, made by the original owners of the thirty-nine mills, included by express terms the good will of the mills which was included in the original valuation of the mills at $2,250,000, and besides, that

the original contracts were in each case accompanied by an undertaking on the part of the vendor not to engage in the business for five years, and that the preliminary contract with Stein also included the good will.

I shall deal with this element of good will at once.

Lord Eldon, in *Cruttwell* v. *Lye* (*1810*), *17 Ves. 335* (at *p. 346*), said: "The *good will* which has been the subject of sale *is nothing more than the probability that the old customers will resort to the old place.*"

This definition, though often criticised, seems to me to contain the germ of all the more modern and complete definitions.

I am willing to adopt, for present purposes, that written by Judge Lacombe, of the United States circuit court, and reported in *Washburn* v. *National Wall Paper Co., 81 Fed. Rep. 17* (at *p. 20*), and cited *in extenso* in defendants' printed argument: "Good will has been defined as 'all that good disposition which customers entertain towards the house of business identified by the particular name or firm, and which may induce them to continue giving their custom to it.' There is nothing marvelous or mysterious about it. When an individual, or a firm, or a corporation, has gone on for an unbroken series of years conducting a particular business, and has been so scrupulous in fulfilling every obligation, so careful in maintaining the standard of the goods dealt in, so absolutely honest and fair in all business dealings that customers of the concern have become convinced that their experience in the future will be as satisfactory as it has been in the past, while such customers' good report of their own experience tends continually to bring new customers to the same concern, there has been produced an element of value quite as important—in some cases, perhaps, far more important—than the plant or machinery with which the business is carried on. That it is property is abundantly settled by authority, and, indeed, is not disputed. That in some cases it may be very valuable property is manifest. The individual who has created it by years of hard work and fair business dealing usually experiences no difficulty in finding men willing to pay him for it, if he be willing to sell it to them."

This language was used in a case where the capital stock was

issued, as here, for the value of several manufacturing establishments, in which the individual good will of each separate factory was added to the value of its visible property (precisely as would have been the case here if the stock had been issued for the amount of the sum of the valuations of the several mills with their good will added, to wit, $2,200,000), and the bill was filed by stockholders who received their stock in payment for a mill which they owned and conveyed to the corporation, and they sought by their bill to enjoin the payment of dividends on the stock so issued. It was held that they were estopped from setting up that the property had been overvalued, and, further, that the evidence was insufficient to show such a depreciation in value as would warrant the relief prayed for.

Turning to the present case, we find, as before remarked, that the individual good will of the different properties was included in the individual valuations thereof, and conveyed for the consideration above mentioned to the corporation.

Further, the inference is irresistible that the corporation itself could not possibly, at the time of its organization, have acquired any good will in the proper sense of that word, or, indeed, in any sense of that word. It had made no business friends nor any business reputation. Moreover, an examination in detail of the plan of business laid out and adopted by the promoters of the enterprise, from which they expected to reap such great profits, contemplated a complete destruction of the old good will of the individual establishments.

Mr. Stein had, in fact, no good will to convey with the mills except what he acquired from the individual owners, hence the increase in price cannot be justified on that basis.

It follows that we are driven back to the question first stated—whether prospective and contingent profits of any business, depending, as they always must and do, upon good management and the general course of business of the country, including, always, the element of competition, can be treated as *property* in the sense in which that word is used in the statute above cited.

It seems to me that there can be but one opinion as to the soundness of the notion that profits derived, or to be derived,

from the prosecution of any business can be properly taken into account, except to a limited extent, in estimating the value of the mere inanimate instrument which is used in conducting that business. Of course, an instrument which is incapable of producing a product to advantage is of no value. On the other hand, an instrument which produces something of great value at little cost is of itself of value, which, however, is limited by the cost of reproducing the instrument itself.

Of course, an inanimate instrument which has an extraordinary capacity for producing an article of value is usually covered by a patent, and to the actual cost of its physical reproduction must be added the patentee's fee or license, but in the absence of any right arising out of a patent the actual cost of the physical reproduction is the test.

Hence the gross profits to be derived from the carrying on of any ordinary manufacturing business are to be divided—*first,* into a fair rental for the factory, based on the cost of its reproduction; *second,* interest on the working capital; *third,* cost of operating and of administration. The balance, if any, is net profit.

For example, if an ordinary manufacturing business should be unusually successful for a series of years and earn large dividends on the amount of capital invested, no one would think of increasing the valuation of the mill by reason of these profits beyond the cost of its reproduction. The profits were due, in the main, to good management, aided by the general prosperity of the country. Without proper management there might, and probably would, be no profits, and then, on the basis of measuring the value of the mill by the profits of its operations, the mill would be valueless.

The present case is a painful illustration of the utter impossibility of giving the word "property" the construction claimed for it.

The rose-colored future (presently to be stated at length), for this enterprise, created with so much confidence by its promoters, failed entirely in the face of actual experience.

In the first place, the combination did not include all the mills which it was intended to include. There is some dispute

and some indefiniteness in the evidence on this subject. The complainant contends that there were, in fact, seventy-three mills engaged in the manufacture of straw paper, and that the original plan and appraisement included all of them.

The defendants admit forty-one, two of which they were unable to purchase, except at prohibitory prices. The proof is clear that there were several more, but just how many is in doubt.

It appears from defendants' printed argument, sustained by the proofs, that the failure of the enterprise was due to four causes—*first,* the financial depression of 1893; *second,* the starting up of old mills and the building of new mills as soon as the corporation put up the price of paper; *third,* bad management of its affairs; and *fourth,* the introduction of wood pulp as the basic material of wrapping paper, such as was manufactured out of straw.

I quote from defendants' printed argument as follows:

"Up to the time of its organization straw paper had no competitor [in fact wood pulp had been introduced to a limited extent], and *the corporation as organized temporarily increased prices, and the result was that new mills were immediately constructed* and competition was inaugurated."

With regard to the management it says:

"Although the directors [chosen from among the mill owners who had received cash and stock for their mills] did their utmost to struggle against this adverse fate, it was found that their views did not harmonize; that *many of the mills were mismanaged and that the best results were not obtained.* In consequence, Dr. Higgins [a director] was finally chosen as general manager, but, as he says, it was too late. He says: 'Well, the management was in the hands of the directors. There was no head to it; that was the trouble with the corporation from its incorporation; there was no head to it until after the general manager was appointed.'

" '*Q.* He was appointed too late?'

" '*A.* Yes, sir; that was my idea about it; no question about it.' "

Mr. Samuel Untermeyer's evidence is to the same effect.

Dr. Higgins, in another part of his testimony, gives the same evidence more in detail.

Now, all these elements enter into the usual uncertainties and

contingencies of business which should have been anticipated by the promoters in their estimate of the prospective profits of this enterprise, even if it were at all lawful to consider those profits.

The final disaster was so complete that the sale under foreclosure, after protracted litigation, of all the property of the corporation produced little or nothing for the mortgage bondholders after paying the expenses of the legal proceedings.

The annihilating extent of this disaster appears to have been due mainly to the grasping disposition of the parties who advanced the money, $1,000,000, on the bonds, which bore six per cent. payable in gold, manifested by their accepting a bonus of stock with their bonds.

The history of the enterprise may be epitomized as follows:

The company obtained possession of the mills and started to operate them during the first half of the year 1893. Some of them were never started, some of them were destroyed by fire, and by the end of the year 1894 their general average condition and value, taken as individuals, was considerably depreciated. At the end of the year 1894 the company was insolvent.

Proceedings to foreclose the mortgage were commenced in January, 1895, and if they could have progressed in ordinary course, without litigation, and the property brought to sale without delay, it is quite probable that it would have produced enough to have paid the mortgage, and possibly something more.

But some of the western stockholders, being informed of the fact that shares of stock to the extent of $600,000 had been issued and added as a bonus in that proportion to the purchasers of the bonds, intervened in the foreclosure, and set up that fact as a defence, but were defeated, as reported in *Northern Trust Co.* v. *Columbia Straw Paper Co., 75 Fed. Rep. 936.*

The contestants appealed from this decision to the circuit court of appeals, and were there again defeated, as reported in *Dickerman* v. *Northern Trust Co., 80 Fed. Rep. 450.*

The supreme court of the United States granted a *certiorari* to the proceedings with the result that the decree for foreclosure was affirmed, as reported in *Dickerman* v. *Northern Trust Co., 176 U. S. 181.*

In the fifth division of his opinion, commencing on *p. 196,* Justice Brown gives an interesting and instructive *résumé* of the history of the corporation.

This decree was rendered in January, 1900, five years after the commencement of the suit. In the meantime the property, had been in the hands of a receiver appointed by the federal court, and most of the mills had fallen into dilapidation and more had been burned, with the result, before mentioned, that they brought at the sale little or nothing for the bondholders.

I quote from defendants' printed argument:

"In the meantime, however, fire had laid waste an additional number of mills; but few of them were occupied by tenants; those that were vacant had become dilapidated and the prey of trespassers and thieves; valuable machinery was carried away or irreparably damaged; the buildings went to rack and ruin; some other properties were sold for taxes. The usual fate of a defunct manufacturing plant was encountered."

This result forcibly reminds one of the time-honored fable of the milkmaid, who became so elated by a day dream of the beautiful frock and bonnet which she would buy with the chickens to be hatched and reared from the eggs to be purchased with the milk she was carrying on her head, that she gave her head such a toss of exultation that she spilled the milk, and had in its place only a practical example of the wisdom of the homely but wholesome precept of her mother: "Do not count your chickens before they are hatched."

It will be observed that the consolidation of the ownership of these thirty-nine mills did not increase in the least degree the producing capacity of each, nor did it increase the range of the farming country in the neighborhood of each from which they were to derive their raw material. They were, in the main, widely separated from each other, so that the case is in marked contrast with those which occur where several properties lying contiguous to each other may be applied to a purpose for which they could not be used except under a combined ownership. Instances of this readily occur to the mind and are found in the books. Several small city lots, covered, if you will, with moderate dwellings, may be worth a great deal more for the purpose of erecting a large hotel or other building requiring

4

considerable of ground space than the aggregate of the separate value of each for individual dwelling-house purposes. So several contiguous lots of unimproved land, under which a large vein of valuable minerals is known to exist, may be more valuable by reason of combined ownership, which enables the minerals to be sought for and brought to the surface much cheaper and to a better advantage than under separate ownerships. So with regard to veins of ore cropping out to the surface under the peculiar mining laws in force in the Rocky mountain regions and so leading to insoluble problems of conflict of title as in *Geer* v. *Amalgamated Copper Co., 61 N. J. Eq. (16 Dick.) 364.* Something similar to that occurred in our own state in the case of *Meredith* v. *New Jersey Zinc and Iron Co., 55 N. J. Eq. (10 Dick.) 211,* see *pp. 214* and *215.* There the conflicting rights under the divers grants had rendered the solution of the questions arising thereout practically impossible, and a consolidation of ownership increased the value of both rights.

Nor was there anything in the nature and character of these properties to indicate that they could not be readily and easily duplicated, as in fact they were as soon as prices rose.

But the defendants say the practice of so valuing property under our statute has been indulged in frequently before, and numerous corporations have been organized and have existed upon such a basis, so that, they argue, the practice has become well nigh crystalized and sanctioned by long usage.

I am sorry to feel constrained to admit that this practice has been frequently indulged in, and, further, that it has brought obloquy upon our state and its legislation. But I am happy to be able to assert, with confidence, that such practice is entirely unwarranted by anything either in our statute or in the decisions of our courts, and whenever it has been indulged in it has involved a clear infringement of, if not a fraud upon, the plain letter and spirit of our legislation.

So far from approving these transactions, our court of errors and appeals has recently, in a case not yet reported, made a decision and rendered an opinion, in which it disapproves of these inflated transactions in the most emphatic and practical manner. I allude to the case of *Volney* v. *Nixon,* since reported,

(*68 N. J. Eq. 605*), the opinion in which I have had opportunity to examine, the headnote of which is as follows: "A contract between two persons that, in exchange for their joint property, one of them shall procure from a corporation of this state an original issue of stock to an amount known by all parties to be in excess of the value of the property, and shall divide the stock thus procured with the other person, is illegal; and the courts of this state will not aid in its enforcement, even though the objectionable feature has been accomplished by the actual issue of the stock."

In the course of the opinion the learned judge (Dixon) remarks: "It must be remembered that under the laws of New Jersey the stock of the corporation can be originally issued for property purchased only to the amount of what is honestly deemed by the directors the value of the property." Referring to *Donald* v. *American Smelting Co., 62 N. J. Eq. (17 Dick.) 729.*

"But," say the defendants, "we acted in perfectly good faith; we really believed this property was worth the amount at which it was appraised, and we were guilty of no fraud in that behalf; and to show our good faith we invested therein several hundred thousand dollars ($467,000) in cash, besides $50,000 in services and expenses of the law firm of Guggenheimer & Untermeyer, and their correspondents in Chicago, and have lost it all." And a powerful appeal was made to the court not to subject the defendants to further loss by saddling these enormous debts upon them.

Let us consider the affair from the standpoint of the defendants, and inquire just how and for what they invested their money.

The real estate and good will of the thirty-nine mills footed up in value, for purposes of sale to the corporation, to nearly $2,200,000, and, after allowing for the overvaluation, which we all know that the individual owners of these industrial properties about to be united usually manage to maintain for that purpose, and of which there is some proof in this case, we may reasonably suppose them to be worth $1,500,000, and thus to furnish reasonably good security for $1,000,000 of bonds. Hence it

was reasonably safe to invest at par in the bonds to the extent of $1,000,000, secured by a mortgage upon the property.

There was little reason to anticipate the completeness of the final catastrophe. The cause of that completeness I have already stated.

Now, that investment at par in six per cent. bonds secured by a mortgage on property worth at least one and one-half times the amount of the sum secured, is all that any of the defendants risked.

Not one dollar was invested by any of them beyond the par value of the mortgage bonds of the company. For every $1,000 paid into the company they received a mortgage bond for that amount, and, besides, a bonus of two shares of preferred and four shares of common stock.

It is thus made clear that when the faith of these investors in the value of the property purchased was put to the actual test it went no further than to invest at par in first mortgage six per cent. bonds, secured by property estimated to be worth about twice the amount of the mortgage, to which bonds was added as a bonus, sixty per cent. of stock representing the value of the property above the mortgage.

This transaction is known, in the language employed in these financial transactions, as "getting in on the ground floor," and was so understood by each of the investors. Mr. Heppenheimer, in fact, uses this very language in his evidence. In answer to a question put by me whether he "did not think Mr. Untermeyer was making you a big present?" he replied, "No, he was not making me any present, but letting me in on the ground floor; that is the way all these corporations have been formed in the State of New Jersey."

No doubt each of these investors really, and therefore in good faith, hoped and expected that the enterprise would prove what they called a success; that is, that the bonds were entirely safe, and so, probably, was the preferred stock, and in like manner it was hoped and expected that the common stock would receive periodical dividends for a period of time long enough at least to enable some, if not all, of it to be marketed, or, to use the

apt phrase which has been applied to such transactions, *"to be distributed to,"* and later to be *"digested by the public."*

I am unable to find that the defendants' belief and faith went beyond this.

But I am unwilling to adopt the notion that this sort of good faith is that which is required in order to legalize transactions like this under consideration.

And here we find the real motive and reason which give rise to these inflated values and "watering" of capital stock. It is the desire and intention to sell shares in a property owned by the corporation—for that is what capital stock represents—for more than they are really worth. And therein lies the intrinsically fraudulent character of these transactions.

I feel justified in so characterizing them, since the overvaluation of the property does not at all or in any manner increase its intrinsic or practical value, or in the least degree promote the real prosperity of the enterprise. A single paper mill will turn out just as much product capitalized at $100,000 as $200,-000, and its rental value will be practically the same. The earnings and profit due to good management and skillful handling of the product will be the same, and these last do not depend at all upon the product-producing capacity of the mill. Finally, the division of the profits, if any there be, among the stockholders will be on the same basis, and the amount received by each stockholder will be the same, the only difference being in the percentage of the division, and the market values of the shares will finally settle down to the gauge of the dividends earned and declared.

But this straightforward mode of doing business does not satisfy the present-day promoter, whose object in making an overvaluation is twofold.

*First.* To sell shares at more than their real value, and thereby secure a *profit* immediately in hand. ("Profit" is the word used by Mr. Samuel Untermeyer in his evidence.)

*Second.* To obtain mercantile credit based on a large capital.

A large number of authorities, in apparent support of inflated values for purposes of capitalization, from different states in the union, were cited by counsel for defendants.

I shall not stop at this moment to discuss their value in this state and in this connection, because I find the law laid down in this state, under this statute, by the court of errors and appeals in the very recent case, cited by the defendants, of *Donald* v. *American Smelting Co., 62 N. J. Eq. (17 Dick.) 729.* That case arose under the *act of 1896,* in which the language of the governing section (section 49) is more liberal than the corresponding section of the act governing the present case, in that it has added the words, "and in the absence of actual fraud in the transaction, the judgment of the directors as to the value of the property purchased shall be conclusive."

That, indeed, was a suit by a stockholder in a corporation, already organized and engaged in its legitimate business, to restrain an issue of stock in payment of additional property to be purchased, but the rule laid down by the learned judge, who spoke for a majority of the court, applies with equal, and I think greater, force to the present case, where creditors are asking for payment of their just debts.

After quoting (*p. 731*) section 48, and a portion of section 49 of the *act of 1896,* he proceeds: "The meaning of section 48 is not questionable. The money must equal the face value of the stock. The language of section 49 is even more explicit. The corporation may issue stock to the amount of the *value of the property*. The value of the property in the one case just as the value of the money in the other must at least equal the face value of the stock. Such was the view expressed for this court by Mr. Justice Depue in *Wetherbee* v. *Baker, 35 N .J. Eq. (8 Stew.) 501,* and supported by abundance of authority.

"The distinction between the contemplated issue of corporate stock for property and its issue for money lies not in the rule for valuation, but in the fact that different estimates may be formed of the value of property. When such differences are brought before judicial tribunals, the judgment of those who are by law entrusted with the power of issuing stock 'to the amount of the value of the property,' and on whom, therefore, is placed the first duty of valuing the property, must be accorded considerable weight, but it cannot be deemed conclusive when duly subjected to judicial scrutiny. Nor is it necessary that

conscious overvaluation or any other form of fraudulent conduct on the part of these primary valuers should be shown to justify judicial interposition. Their honest judgment, if reached *without due examination into the elements of value, or if based in part upon an estimate of matters which really are not property, or if plainly warped by self-interest, may lead to a violation of the statutory rule as surely as would corrupt motive.*

"The cases in this state to which we are referred (citing cases) in support of the proposition that the honest judgment of the managers of a corporation, with respect to matters *intra vires,* cannot be disturbed at the instance of stockholders; all relate to transactions for which the legislature has set up no other criterion than the discretion of those managers. But the original issue of corporate stock is a special function, in the exercise of which the legislature has fixed the standard to be observed, and it is the duty of the courts, so far as their jurisdiction extends, to see that this standard is not violated, either intentionally or unintentionally."

This language, as I understand it, contains the very *ratio decidendi* of the case then under consideration, and is, therefore, binding on me, even if I did not concur in it, which I do most heartily.

The intention of the legislature expressed in these sections in question, in my judgment, manifestly was, that the capital stock of all corporations should *at the start* represent the same value whether paid for in property or money. That result can only be obtained by supposing that the property is to be appraised at its actual cash value, precisely as if a board of directors with the whole capital stock actually paid in cash is dealing at actual "arms'-length" as real purchasers with the owner of property proposed to be purchased as a real vendor without any interest in the directors to overvalue the property or other interests inconsistent with the real interest of the stockholders as such.

I say "at the start," because we all know that property purchased in good faith for cash is liable afterwards to depreciate in value owing to circumstances not foreseen at the time of its purchase.

After all, it seems to me that the true test, under this statute,

as applied to the case here in hand, is this: if the company actually had to its credit in the bank the sum of $5,000,000 would it have been willing to have paid that price in cash for the property in question for the uses and purposes to which it proposed to devote it; would the property be worth that sum in cash to the company?

Any less severe test will, it seems to me, fail to satisfy the letter and spirit of the two sections of the act before recited, which seem to me clearly to require that the shares of capital stock of any company organized under the act in force when this company was organized should be of equal value whether paid for in cash or property purchased.

I have discussed the matter on the basis of $5,000,000, because that was the basis of the organization, but in point of fact it was reduced to $4,750,000 by a retention of $200,000 for working capital, and $50,000 by the expense of organization, launching and financing of the company, as will appear hereafter.

The learned judge, however, in *Donald* v. *American Smelting Co., supra,* after using the language above quoted, proceeds to express some thoughts, which, so far as I can perceive, are not necessary to the decision of the cause, and so necessarily in the nature, at best, of *obiter dicta,* and therefore not binding upon me.

I venture to suggest that their object was to show the effect of stock once issued coming into the hands of a *bona fide* purchaser. They certainly have no application to the present case in which creditors are suing.

They are, however, relied upon by the defendants and are as follows:

"When corporate stock has once been issued for property purchased, then the legislature has directed the application of a different rule. In the words of the same section 49, the stock so issued shall be full paid stock, and not liable to any further call, *neither shall the holder thereof be liable for any further payment under the provisions of this act;* and in the absence of actual fraud in the transaction the judgment of the directors as to the value of the property purchased shall be conclusive."

(This last clause is not found in the act governing the transaction here in question.)

"Under these provisions, after the property has been purchased and the stock issued therefor, nothing short of *actual fraud in the transaction* can impair the right of the holder to hold his stock as full paid stock, free from further call."

As applied to the case then before the court of errors and appeals, I understand that language as holding that if the stock, the issue of which was sought to be restrained, should be issued with the words "issued for property purchased" printed on the certificate, it would not be competent for the company to deny the validity of the stock and the rights of the holders of the certificates on the ground that the property had been overvalued, unless there was fraud practiced by the vendor on the vendee.

He did not have in mind the case of creditors. (And see the language of Mr. Justice Brown in *Handley* v. *Stulz, 139 U. S. 417,* at *p. 426*).

Moreover, the construction of that language claimed by defendants would result in a practical nullification of the section of the act first above quoted, which declares the liability to creditors of stockholders who have not paid in the amount of their stock, or have paid for it in property at an overvaluation, since it is entirely practicable to purchase the property and issue the stock in a single transaction and before any creditors exist or any judicial interference can be made. In short, the construction claimed would run directly counter to the carefully-prepared opinion of Justice Depue, in *Wetherbee* v. *Baker, 35 N. J. Eq. (8 Stew.) 501* (at *p. 511 et seq.*), relied on by the learned judge in his opinion here in question.

In reading the opinion in *Wetherbee* v. *Baker,* it must be borne in mind that the case there dealt with arose under a statute which apparently contemplated an actual subscription for stock, and there appeared to have been such subscription in that case. But the fifth section of the Corporation act above quoted, which governs this case, does not contemplate or require any actual subscription to stock, but deals with the stockholder who accepts and holds stock without paying for it in full.

Moreover, as is shown by authorities presently to be cited,

there is no distinction in equity between a party who makes a formal subscription for stock and fails to pay for it and one who accepts a full paid certificate without paying for it.

But, taking the language of Justice Dixon, as last above quoted, as the statement of the law, it is quite clear that a conscious overvaluation is a fraud on the law, in that it is an evasion of its mandate, and is the very sort of fraud mentioned in the statute. It was so treated throughout the opinion of Vice-Chancellor Stevens in the same case, *61 N. J. Eq.* (*16 Dick.*) *458*, and the language of Justice Dixon, just quoted, leaves no room for doubt on this point, where he says: "Nor is it necessary that *conscious overvaluation or any other form of fraudulent conduct* on the part of these primary valuers should be shown to justify judicial interposition. *Their honest judgment, if reached without due examination into the elements of value, or if based in part upon an estimate of matters which really are not property, or if plainly warped by self-interest, may lead to a violation of the statutory rule as surely as would corrupt motive.*"

If, then, the promoters of this enterprise and the directors, who assisted them in adopting the valuation in question, consciously included in their valuation thereof "an estimate of matters which really are not property," which I have shown they did, then there was a conscious overvaluation of the property which amounts to a fraud on the act.

A strong appeal was made to the court in the argument of defendants' counsel, based on the fact that these defendants had lost between $300,000 and $400,000 of cash, and that no further loss ought to be thrown upon them. With regard to that plea I have this to say: Men of business, who transact their business under the shield of a corporate existence, have the great and peculiar advantage over those trading as individuals of avoiding personal pecuniary liability. If the enterprise is prosperous, they make and enjoy its gain. If, on the other hand, it is not prosperous, they lose only their original investment, which may be a part only of their individual fortunes, and any loss beyond that investment falls on the unfortunate creditors. This involves apparent, if not real, unfairness in trade. Be that as

it may, under these conditions, surely the investors in the stock of trading corporations ought not to complain or ask any sympathy if the courts of the country hold them to a strict compliance with the terms of the law under which they claim immunity from pecuniary responsibility.

They ought not to complain if the creditors of the corporation shall demand that the original statement of their capital stock shall be made good by those persons who accept it from the company.

In this case, on May 17th, 1893, the president (Beard) and the secretary (Guggenheimer) filed with the secretary of state of this state a verified certificate that the whole capital stock of $4,000,000 had been paid in as follows, viz., $1,800 in cash and $3,998,200 *"by the purchase of property at the fair value thereof."* This certificate, it will be observed, does not state that the property was subject to a mortgage for $1,000,000.

Justice Depue, in the case of *Wetherbee* v. *Baker, supra* (at *p. 511*); says: "The capital stock subscribed is a substitute for the personal liability of partners in ordinary co-partnerships, and creditors are entitled to a *bona fide* exercise of the compulsory powers of the corporation to compel subscribers to pay in their subscriptions." And, on *pages 512* and *513*, after stating that where property is taken instead of money it must appear that the property was taken at a fair and *bona fide* valuation, he continues: "The courts have inflexibly enforced the rule that payment of stock subscriptions is good as against creditors only where payment has been made in money, or in what may be fairly considered as money's worth [citing authorities]. Indeed, courts could not on any other doctrine administer the law of corporations with the immunity of stockholders from responsibility for the debts of the corporation, and the substitution of stock subscriptions in the place of their personal liability, without opening the door for the grossest frauds upon creditors." (Citing and discussing authorities.)

In my judgment, simple justice and common honesty require the law to be firmly enforced against these defendants.

I have so far considered the case from the defendants' standpoint.

The counsel for the complainant, however, say that there are facts in the case not yet considered which should be taken into account, which show that there never was any such valuation of the property purchased in this case as this court can sanction as such, and that the formal proceedings relied upon by defendants for that purpose were the merest shell and sham, and quite devoid of the least substance which any court can recognize, and worked a deliberate fraud, not only on the future creditors of the corporation, but upon the vendors of the mills who took its stock in part payment for their property.

I feel constrained to spend some time and space in dealing with this contention on the part of the complainant.

In the spring of 1892 there were in existence in that part of the western country, viz., Nebraska, Kansas, Missouri, Iowa, Wisconsin, Michigan, Illinois, Indiana and Ohio, of which Chicago is the great commercial centre, between forty and fifty, as admitted by the defendants, and over seventy, as claimed by the complainant, mills engaged in the manufacture from farmers' straw, mainly rye and oat, of the ordinary wrapping paper commonly used by butchers and grocers.

The trade, so far as regards profits, was in a languishing condition, caused, as defendants claim, by excessive competition between themselves, and to this cause complainant claims is to be added further competition due to the then recent introduction of wood pulp as a cheaper material in the place of straw.

The owners of a majority of these mills had previously on one or two occasions combined to stop competition and increase the price of this product with temporary success, and in the spring of 1892 were conferring with a view of making a more perfect combination. This condition of things came to the knowledge of one Emanuel Stein, who was engaged in business, not connected with paper, in Chicago, and had a brother-in-law named Ramsdell engaged in the boot and shoe business in Buffalo. Also residing in Buffalo was a gentleman named Beard, the vice-president of a savings bank. At the suggestion of Stein the three entertained the notion of consolidating the plants of these straw paper makers into a corporation. Mr. Beard waited upon Mr. Samuel Untermeyer, of the law firm of Guggenheimer &

Untermeyer, of New York City, and he undertook that his firm should act as counsel in organizing a corporation for that purpose under the laws of the State of New Jersey. He had had much experience in that kind of business and gave to the affair in hand his personal attention from that time on.

Mr. Untermeyer prepared a form for a blank option, which ran in the names of Beard and Ramsdell as purchasers, for the purchase of the several mills, leaving, of course, blanks for the names, consideration money, the description of the properties and terms of payment. These were taken by Stein, who forthwith proceeded to visit and make bargains with thirty-nine mill owners, but was unable to come to satisfactory terms with at least two of those included in the original list agreed upon by the promoters.

The actual work, however, of negotiating and bargaining with the mill owners was conducted by three gentlemen, named respectively Halliday, Church and Trebein. The first a dealer in paper in Chicago and the other two being mill owners. The three were assisted by Mr. Sherwood, a lawyer.

Stein's work in this respect was completed early in October. The options expired the last day of the year. In the meantime Mr. Ramsdell withdrew from the enterprise and assigned his interest in the options to Mr. Stein.

It seems clear enough that Stein, Beard and Samuel Untermeyer then entered into the plan jointly, each one to have one-third of the profits, each one to raise one-third of the money necessary to carry it through, and Mr. Untermeyer's firm to attend to all the legal aspects of its management and to be paid therefor the sum of $50,000.

The substance of the options (too long to be transcribed in full) was that Beard and Ramsdell were to organize a corporation with a share capital of $1,000,000 of preferred stock, $3,000,000 of common stock and a mortgage debt of $1,000,000, and the owner of the property agreed to convey to Beard and Ramsdell, or to a corporation to be organized by them, the property described and the good will of the business, including trade marks and trade names; then followed the clause for payment to be so much in cash, so much in preferred stock and so much

in common stock; then followed a covenant on the part of the optionor not to go into business at any time within five years; then there was a provision that other mills should be taken into the corporation, and that the contracts with the other mills should be of the same character.

Justice Brown, in speaking for the supreme court of the United States, in *Dickerman* v. *Northern Trust Co., ubi supra,* construes this document as amounting in substance to a declaration that the options were to be secured for the benefit of the corporation, and such appears to have been the understanding of the mill owners. I agree with Judge Brown in his construction.

This view would exclude any profit to the intermediaries.

Moreover, it is too clear for argument that the language of the option cannot be relied upon to authorize the issue of all the stock as full paid without regard to the number and value in the aggregate of the mills purchased. It is quite absurd to suppose that the optionors were willing or supposed that they had contracted on any such basis, since they were directly interested in the value of the stock which they took in part payment for their mills, and that value depended upon the number and value of the mills which it represented.

The true construction of the options in that regard is that the corporation to be formed would, out of the $4,000,000 of stock at which it was capitalized, issue only enough to pay for the mills actually purchased, and any beyond that would be issued for cash or its equivalent, allowance being made, always, of course, for the cost of the organization proceedings.

The options of thirty-four of the thirty-nine mills provided, in round numbers, for payment of between $600,000 and $700,000 in cash, the same amount in preferred stock, the same amount in common stock, at fifty cents on the dollar.

The remaining five mills were optioned on a different basis and were finally purchased on special terms, and their purchase forms by itself the basis of a charge of actual fraud upon the corporation practiced by the three gentlemen whom I join with complainant's counsel in calling the promoters of this enterprise.

Acceptances of the options were then prepared by Mr. Untermeyer and served upon each vendor by Mr. Stein, describing himself as assignee of Ramsdell and Beard.

Each of the promoters then set about raising the money to meet the required payment of cash, and each on the same basis hereinbefore stated, namely, $1,000 in mortgage bonds, $200 of preferred stock and $400 of common stock for each $1,000 raised.

The $1,000,000 cash to be raised was to be applied as follows: Seven hundred and fifty thousand dollars to the purchase of the mills, $50,000 to Messrs. Guggenheimer & Untermeyer, for legal services and expenses, and $200,000 to working capital.

Mr. Stein's success in raising his share of the money, as I understand the evidence, was mainly in inducing vendors to accept bonds and bonus stock instead of cash.

Mr. Beard met with some success in raising cash among his friends in Buffalo, among others, Mr. Corbin's client, the defendant Hall.

Mr. Untermeyer raised much more than his share of one-third. He took $50,000 of bonds, with the accompanying stock bonus, for his firm in payment of its fee, and besides that duly marketed by himself and his friends $467,000 of bonds. This was all done in advance of the creation and organization of the corporation, and a great part of the money seems to have been paid to Mr. Untermeyer before or about the time that the corporation was created, and considerably in advance of the actual issue of the bonds.

This seems to have been accomplished by the aid of an ingenious and elaborate prospectus, gotten up by Mr. Untermeyer, with the aid of his Western associates, which showed the state of the straw paper industry in the West; the daily producing capacity of the aggregate of the forty-one mills west of the Alleghenies at about three hundred tons a day; the cost of the making of the paper at $18 per ton; the present selling price at $21 per ton; the annual demand at ninety thousand tons— which, at a profit of $10 per ton, to be obtained by creating a monopoly and raising the price to $28 per ton, would yield a profit of $900,000 a year.

The · prospectus contains no statement of the value of the forty-one mills, taken individually, or what would be the cost of reproduction of those mills, or of erecting competing mills.

This prospectus consisted of two papers, called in the cause Heppenheimer No. 3 and Heppenheimer No. 4.

In addition to this rose-colored general prospectus was another, which seems to have been used by Mr. Untermeyer among his particular friends in the East. This was headed, "Confidential, for private circulation only." It stated the proposed incorporation, with $4,000,000 of stock—ten thousand shares of eight per cent. preferred, $1,000,000; thirty thousand shares of common, $3,000,000—and then was added these significant words: "The *vendors and their friends* retain $800,000 of the preference stock and $2,600,000 of the common stock."

Then follows the statement that $1,000,000 in cash was to be raised by bonds secured by mortgage, of which $750,000 is to be paid to the vendors on account of the purchase price of the properties to be acquired, *"being about one-third of the appraised value of the property;"* $200,000 will be placed in the treasury for working capital, and the remaining $50,000 of the $1,000,000 will be used for the legal and other charges for incorporating the company. Then come the names of the proposed directors "who have consented to act after the purchases have been consummated and the stock allotted," being Mr. Beard, of Buffalo, seven Western gentlemen, including Trebein, Church and Stein, and one—the ninth—left blank, which was afterwards filled by Mr. Heppenheimer.

Then follows a condensation of the previous general prospectus.

Then follows a blank subscription to mortgage bonds of the company, payable in installments, the bonds and stock to be delivered as soon after the organization of the company as they can be printed. The subscription closes with these significant words: "With each $1,000 subscribed for, the subscriber will be entitled to receive a *bonus* of $200 preferred stock and $400 common stock," the total of which, it will be observed, on $1,000,000 deducted from the whole issue of stock, will leave just $800,000 of preference stock and $2,600,000 of common

stock previously mentioned as retained by the *vendors and their friends.*

Mr. Untermeyer then prepared the articles of incorporation and caused them to be executed by Mr. Beard and Mr. Untermeyer's personal secretary, Mr. Taylor, and his friend, the defendant William C. Heppenheimer, who had attended as New Jersey counsel to the numerous corporations in this state which Mr. Untermeyer had previously organized. This was on December 2d, 1892.

The seventh article of this certificate is as follows:

"The company will commence business with ten thousand (10,000) shares of preferred stock of the par value of one million dollars ($1,000,-000), being its entire authorized issue of preferred stock, and with twenty-nine thousand nine hundred and eighty-eight (29,988) shares of common stock or general stock of the par value of two million nine hundred and ninety-eight thousand eight hundred dollars ($2,998,800), and with twelve hundred dollars ($1,200) in cash, being the proceeds of the sale of the remaining twelve shares of the common or general stock of the company."

It was filed in the Hudson county clerk's office and recorded December 3d, 1892, and filed in the secretary of state's office December 6th, 1892.

Mr. Heppenheimer had been made acquainted by Mr. Untermeyer with the details of the whole scheme and he had agreed to come in "on the ground floor" for $5,000, and paid the money on December 12th, 1892, to Mr. Untermeyer.

In the meantime a cheap book of certificates of the common stock and also one of the preferred stock had been printed and a seal of the corporation procured, and on the 14th of December nine certificates of stock, amounting in the aggregate to $1,800, were issued, sealed and signed by Mr. Beard as president and Mr. Heppenheimer as treasurer, as follows: one to Mr. Heppenheimer for four shares, one to Beard for four shares and one to Taylor for four shares, and one each to Morris Untermeyer, Moses Weinman, Theodore L. Herrmann, J. C. Guggenheimer, Samuel H. Guggenheimer and Harry C. Manheim.

All of them, except Beard and Heppenheimer, were either members of the firm of Guggenheimer & Untermeyer, or em-

ployes thereof. Not one of them ever paid one cent for the shares of stock so issued to them, but each of them, except Beard, immediately transferred them in blank and handed them back to Mr. Untermeyer.

Such of them as are defendants hereto had already subscribed to one or more of the bonds on the terms mentioned in the confidential circular.

On the afternoon of December 14th, 1892, the nine persons just mentioned met as incorporators and stockholders at the office of Mr. Heppenheimer, in Hoboken, and held the organization meeting of the new corporation and elected themselves directors for the ensuing year, adopted the seal which had been procured and also an elaborate system of by-laws, all of which had been previously prepared by Mr. Untermeyer.

After that was done Mr. Samuel Untermeyer presented to the meeting an elaborate written proposition prepared by him but signed by Stein to sell and convey to the new corporation the thirty-nine paper mills in question (omitting two of the forty-one mentioned in the original prospectus) at the sum and price of $5,000,000.

The proposition states that he, Stein, held options for that property, and that those options gave him the right to acquire the mills and all the appurtenances together with "the good will thereof," and proceeds to say,

"I will undertake to secure to your company a good and indefeasible title to the property above mentioned, and that I shall pay the entire purchase price necessary to secure the same from their present owners."

The price of $5,000,000, to be paid by $1,800 in cash, $1,-000,000 in six per cent. bonds secured by a mortgage, $1,000,000 in eight per cent. preferred stock, $2,998,200 in common stock.

A list of the mills to be conveyed was annexed to the proposition, but not the price to be paid to the mill owners, nor was any valuation placed on each mill.

This proposition was immediately considered at the stockholders' meeting and accepted by a series of resolutions which had already been prepared by Mr. Samuel Untermeyer who was present and directed the whole proceedings.

The proposition and resolutions were subsequently entered on the minutes at length.

The resolutions provided for a written contract to be executed by the president and Mr. Stein, and such a contract was actually executed, dated December 15th, 1892, and acknowledged December 17th, 1892, in Chicago. (The original was not produced, but a copy of it was annexed to the amended bill of complaint and its execution is admitted by the defendants in their answer. Moreover, it is printed in the record of the foreclosure cause. It follows in its language the proposition and resolutions of acceptance, but provides expressly for a payment into the treasury by Mr. Stein of $200,000 for working capital and for $50,000 to Messrs. Guggenheimer & Untermeyer for the expenses of organization.)

According to the minutes this was all done at the session in Hoboken. Those minutes show another meeting on the evening of the same 14th of December of the directors at the office of Messrs. Guggenheimer & Untermeyer in New York City, and then for the first time regular officers were elected and the board of directors duly organized and the officers were sworn, and a bond given by Mr. Heppenheimer as treasurer.

The organization of the directors being accomplished the meeting proceeded to reaffirm the action of the stockholders in making the contract with Mr. Stein and to adopt the same resolutions.

It is asserted by the defendants that at that meeting held by stockholders representing eighteen shares of stock of the par value of $1,800, the value of the thirty-nine mills was thoroughly discussed, and the information as to their capacity, &c., was obtained by the stockholders from Mr. Samuel Untermeyer, who had himself previously made exhaustive inquiries on the subject.

In point of fact, it is not disputed that the stockholders and directors (the same persons) acted upon the strength of the reliability and truthfulness of the rose-colored prospectus previously prepared by Mr. Untermeyer, by which he showed that the mills, by the establishment of a monopoly, would be able to earn six per cent. interest on their mortgage debt, one per cent.

additional for a sinking fund, eight per cent. on the preferred stock and at least fifteen per cent. on their common stock.

In short, the principal item in the valuation of the property consisted in a present capitalization of the prospective profits due to a monopoly of the wrapping paper trade.

There was no information given to those stockholders and directors, or inquiry made by them, or any of them, as to the contents or general tenor of the several options which Mr. Stein held for the several mills. Mr. Heppenheimer, indeed, swears that his impression was that Stein represented the mill owners— and in this, I think, he is upheld by the true construction of those instruments. Nor was there any information given to those stockholders and directors as to the cost of those properties to Mr. Stein; nor what was the present condition and individual value of each mill to be purchased; nor what would be the cost of replacing those mills, or any of them, or of erecting others, or of erecting others to compete with them under the natural encouragement due to the proposed increased price of the product; nor was any inquiry made as to the adoption of any scheme for the practical management of the new undertaking; nor was any inquiry made as to the probability of any other material being substituted for straw in the making of the peculiar kind of wrapping paper which these mills were fitted to make from straw. Not one of the directors and stockholders had the least knowledge, either from experience or otherwise, of the business about to be launched, and therefore were quite incapable of forming any judgment upon the subject-matter before them, even if the necessary materials for such judgment had been laid before them. Not only so, but none of those contingencies were taken into consideration which every business man habitually and naturally considers in determining the propriety of any enterprise.

The only ones of the directors who can be supposed to have really had before him or them any proper material for making an appraisement of the value of these mills are those who had seen or had been made acquainted with the contents of the prospectus gotten out by Mr. Untermeyer, and headed, "Confidential, for private circulation only," and contained the clause,

"The vendors and their friends retain $800,000 of the prefer-ence stock and $2,600,000 of common stock," followed by the significant statement that $750,000 was to be paid in cash to the vendors, *"being about one-third of the appraised value of the property."*

Moreover, these stockholders and directors were the associates and employes of Untermeyer, who was the managing genius of the whole transaction, and they were chosen by Untermeyer and Beard especially for the purpose of accomplishing at once, and without any lengthy investigation or consideration, the manifest object of the proceeding, viz., the purchase of these properties at the round sum of $5,000,000, payable in cash and securities, of which little more than one-half was to go to the real owners.

These directors were not expected to manage the corporation or to take any further part in it than what has already been stated, for within a week they all resigned, except Mr. Beard and Mr. Heppenheimer, and the board of directors was filled up by the election of several gentlemen, named in the pros-pectus, five of them being former owners or managers of these mills and living in or near Chicago.

But it may be here remarked that the book of minutes, con-taining this preliminary contract between Stein and the cor-poration, was retained by Untermeyer, in New York, for a full year before it was sent to Chicago.

Beard proceeded, promptly, after this meeting of December 14th, to Chicago, and entered into the formal written contract before mentioned with Stein, all before the election of the per-manent board of directors. How soon, if ever, that formal con-tract was made known to the directors does not, so far as I have gathered from the evidence, appear. Of the six permanent directors, other than Beard, Stein and Heppenheimer, only three, so far as it appears, had any opportunity to know of its character, viz., Halliday, Trebein and Church, and the evidence tends to show that each of these gentlemen last named received, without payment in cash, a certificate for $100,000 of the shares of the common stock of the new company.

It will be observed that Stein's proposition and the resolution of acceptance of December 14th, as found on the minute-book, make no mention of the $200,000 reserved for working capital, or of the $50,000 expense of organization and of launching the enterprise, but this was actually provided for in the written contract, and months afterwards was enforced against the three, viz., Beard, Stein and Untermeyer, although the formal contract was signed by Stein alone. The circumstances of its enforcement were as follows: It turned out that the cash actually paid for the thirty-nine mills amounted to $765,000, $15,000 more than was estimated for. The result was that the amount available for working capital was reduced to $185,000, and in September, 1893, the directors called on Messrs. Beard, Stein and Untermeyer to make up the balance of $15,000.

Mr. Untermeyer responded by paying $5,000 in cash and the other two gentlemen by giving their respective promissory notes.

This payment is attempted to be disputed by Mr. Untermeyer, and I shall deal with that further on, but I shall assume its truth at present. It is relied upon as one among many, and is, I think, the crucial fact in the case to show that Untermeyer was one of three promoters in the enterprise.

The position of Stein is equally clear, not only from the verbiage of the options taken, but from the language used by Mr. Stein in his letter, written in October, 1892, to each of the original vendors, accompanying his formal acceptance of the contract, in which he says:

"You will observe that the acceptant asks you to make the deed and other instruments to Emanuel Stein.

"The reason for that is because all of the legal steps which must be taken before the Columbia Straw Paper Company shall be organized may not be completed for some time. As soon as those steps are completed all the titles will be transferred by me to the new company."

Then such of the vendors who have testified state that it was understood that Stein was acting as a mere conduit of title.

Before proceeding to detail the further transactions upon which the complainant relies, let us test this transaction as it stood at the moment the preliminary or "dummy" board of

directors resigned and the permanent board was elected in its place.

The whole transaction was planned by Stein, Beard and Samuel Untermeyer. They three certainly occupied the position of promoters of the corporation, and at the same time as vendors to it.

Judge Brown, in his opinion already referred to in *176 U. S. 181* (at *p. 203*), speaking of those three, says "these men stood in the light of promoters of the Straw Paper Company," and he cites Mr. Cook on *Stock and Stockholders,* in declaring that "a promoter is one who brings together the persons who are to become interested in the enterprise, aids in promoting or procuring the subscriptions and sets into motion the machinery which leads to the formation of the corporation itself." Again, on *p. 204,* he says: "The promoter is the agent of the corporation and subject to the disabilities of an ordinary agent; his acts are scrutinized carefully, and he is precluded from taking a secret advantage of the other stockholders. *Cook Stock.* § *651.* Accordingly, it has been held that, if persons start a company and induce others to subscribe for shares, for the purpose of selling property to the company when organized, they must faithfully disclose all facts relating to the property which would influence those who form the company in deciding upon the judiciousness of the purchase. If the promoters are guilty of any misrepresentation of facts, or suppression of the truth in relation to the character and value of the property, or their personal interest in the proposed sale, the company will be entitled to set aside the transaction or recover compensation for any loss which it has suffered." (Citing authorities.)

"In those cases where the scheme of organization gives the promoters the power of selecting the directors who are to represent the company in the proposed purchase, they are bound to select competent and trustworthy persons who will act honestly in the interest of the shareholders. A purchase made from the promoters under these circumstances will not bind the company unless it was a fair and honest bargain."

The court in that case in their headnote inserted a clause as follows: "Promoters of a corporation are bound to the exercise

of good faith toward all the stockholders, to disclose all the facts relating to the property, and to select competent persons as directors, who will act honestly in the interest of the shareholders, and are precluded from taking a secret advantage of other shareholders."

And this duty of disclosure of all material facts to a competent board of efficient directors is settled law not only in England but in this state. It was so declared by Vice-Chancellor Green in *Plaquemines Tropical Fruit Co.* v. *Buck,* *52 N. J. Eq.* (*7 Dick.*) *219,* and by me in *Woodbury Heights Land Co.* v. *Loudenslager,* *55 N. J. Eq.* (*10 Dick.*) *78* (at *p. 91*), on the authority of Vice-Chancellor Green and the English cases. And my reasoning in that case was expressly adopted by the court of errors and appeals on review in *56 N. J. Eq.* (*11 Dick.*) *411,* by twelve out of fourteen judges. The twelve were divided on the question, whether the recovery should be for the whole or only for the one-half of the sum actually received by Loudenslager, and on a reargument the liability was reduced to one-half. See *58 N. J. Eq.* (*13 Dick.*) *556,* where the decree holding defendant liable for the whole amount was modified by a vote of seven to five.

The duties of promoters in such cases is based upon and arises out of the fact that they are acting as voluntary trustees, and hence are subject to all the rules of law applicable to the conduct of trustees.

It was then the duty of the three gentlemen named—Stein, Beard and Untermeyer—as vendors of these properties to furnish the corporation with a competent and independent board of directors to negotiate this sale. Men who would act wholly in the interest of the future stockholders, and who would not be biased or influenced by the mere persuasions of the proposed vendors or friendship for either of them. It was their duty to disclose to that board of directors their position as vendors, and that Stein was a mere trustee for himself and Beard and Untermeyer. They should then have communicated to that board the actual cost of the several properties proposed to be sold to the corporation, and they should have invited an investigation as to their value and the cost of their reproduction.

Instead of so doing they seem to have carefully concealed all information on the last two heads, viz., the cost of the properties to themselves, the three vendors and the intrinsic value of each. Not one of the temporary directors, not even Mr. Heppenheimer, a lawyer of great intelligence and large experience, knew their aggregate cost, nor did he inquire into it. He frankly declares that he considered himself a mere figurehead. And so in effect do each of the others when put on the witness-stand. Not one of them had had the least experience in the manufacture of paper. But they all swear that they based their judgment entirely upon the verbal representations of Mr. Untermeyer, Mr. Beard and Mr. Stein, principally the first, and upon the prospectus contained in two papers, in substance but one, called Heppenheimer No. 3 and No. 4.

Indeed all but one had already subscribed for bonds to the subscription paper embodied in the circular entitled "Confidential, for private circulation only."

Now, it seems to me that it is impossible to avoid the conclusion from those facts that the contract of sale procured to be adopted by this board of directors on the very day on which they were elected by the management of these three men whose names have just been mentioned and under the personal supervision of Mr. Beard and Mr. Untermeyer, and the formal contract entered into in pursuance of it, was a palpable fraud on the act of the legislature, and was entirely unwarranted thereby, and operated as a fraud, not only on the future stockholders of the company, as was distinctly held by the supreme court of the United States in the opinion so often referred to, but especially upon the future creditors of the company.

Judge Brown (at *p. 203*) of *176 U. S.* declares as follows: "There is no doubt that if this were a suit by creditors to enforce payment of the unpaid portion of the stock subscription, the fact that the stock certificates declared that they were fully paid and unassessable would be no defence."

Judge Showalter, in *75 Fed. Rep.* (at *p. 937*), says: "The case might be different here if the rights of creditors were involved."

Judge Bunn, of the circuit court of appeals, *80 Fed. Rep. 454*, says: "The suit is not prosecuted on behalf of creditors.

\* \* \* No doubt in an action by a creditor against a stockholder a gross and obvious overvaluation of property conveyed to a corporation in consideration of an issue of stock is strong evidence of fraud."

It should be borne in mind that neither of these judges in the federal court, or in the supreme court of the United States, seem, so far as I have observed, to have had presented to him for his consideration the language of our Corporation act which I have already considered.

But further, I am of the opinion that so far as the directors who passed the resolution in question for purchasing this property are concerned, such of them as had already learned the terms on which the mortgage bonds were to be floated, had direct notice that the property was being overvalued. Since they knew that a bonus of sixty per cent. in stock was being given as an inducement to persons to advance cash at par on bonds secured by property which, if worth anything like the sum at which they rated it, ought to be easily negotiated without a bonus, and they knew perfectly well that if the property was worth that amount of money the company could not afford to give such a bonus for money.

Those gentlemen were, some of them, intelligent lawyers, and were bound to know the requirements of our act providing for the purchase of property payable in stock, and what their duty was under the circumstances.

They must have known that the scheme which Messrs. Stein, Beard and Untermeyer were carrying through involved, theoretically, a very large profit to those three gentlemen, and that they were not paying to the original owners of the mills, in the aggregate, anything like the sum of money which they were to receive in stock from the corporation. They had great confidence in Mr. Untermeyer and faith in his skill and good judgment in the management of such affairs, and they had faith and confidence in the ability of the promoters so to manage affairs that the surplus stock would have a market and that they would thereby be able to realize something handsome out of the bonus they were to receive with their bonds. But, after all, they

seemed carefully to have avoided any inquiry into the actual cost of the properties to the promoters.

Under these circumstances, I cannot hold that the judgment of the directors was an honest one in the proper sense of that word, but I must find that it was exercised directly in the interest of their friend, Mr. Samuel Untermeyer, and his associates.

If, then, the decision of this cause were to depend, as defendants contend it should, on the question of fraud or no fraud in the sale, I should feel constrained to find that it was fraudulent in the sense in which that word is used in this connection.

But the complainant takes another point here, which is not without force. I have already said that not one of those gentlemen had paid one cent for the stock issued to him, and that each, except Mr. Beard, was a mere figurehead. Hence the complainant contends that, under our statute then in force (section 47), which declares "that it shall not be lawful for any person to be elected a director of any body corporate of this state issuing stock unless such person shall be at the time of his election a *bona fide* holder of some of the stock of said body corporate;" and, again (section 48), "when any person, a director of any body corporate, shall cease to be a *bona fide* holder of some of the stock thereof, he shall cease thereupon to be a director thereof," none of these persons were competent to become directors.

Now, the question is, whether any of those persons who adopted the resolution for the purchase of this property were *bona fide* holders of stock. I am not aware that this question has ever been considered by our courts in connection with the validity of action taken by a board of directors who lacked the qualification required by the statute, and do not find it necessary to express an opinion upon it at this time.

It is enough, for present purposes, for me to say that I think, admitting the directors to have been competent under our statute to act as such in making the contract with Stein, yet, under all the circumstances, the fact that they had not paid one cent for their stock; that the qualifying shares that they held were so few in number that they were mere figureheads

and did not represent in any sense the interests of the corporation to be formed, and of the persons who were to become the real proprietors of it, but did actually represent throughout the feelings and interest of the three promoters, that their action in that behalf must be absolutely void so far as it authorized the issuing to Stein of any of the capital stock of the company beyond the real value of the property which he proposed to convey and a reasonable compensation to the promoters for their services as such.

The law is perfectly clear that the promoters cannot help themselves in the way these gentlemen attempted to do in this case.

But, say the defendants, "we are not sued here for profits we have made in this promotion, for we have made none. We are perfectly willing to disgorge and turn back the stock which we received and which has proved valueless." "The cases," they further argue, "which are cited against us, such as *Woodbury Heights Land Co.* v. *Loudenslager* and the *Plaquemines Fruit Co.* v. *Buck,* and the numerous cases therein cited, were suits to recover for profits received, and therefore do not apply."

But that argument evades the real question before us, which is whether the defendants have received from this company certificates of stock for which they have not paid.

Samuel Untermeyer concedes that he paid nothing for a large quantity issued to him, and the other defendants admit that their stock was received as a bonus with bonds paid for stock. They all concede that Stein paid nothing except some cash which he derived from the sale of bonds and the conveyance of the property in question, and the sole reliance of the defendants is on the value of the property conveyed. If that property was consciously overvalued in such a manner as to amount to a fraud on the statute, the defendants admit that the transaction will not stand, and it will follow that the certificates of stock issued in question were received without paying anything for them, and it will also follow that the capital, to wit, $4,000,000, has not all been paid in, and then follows the other provision of the statute, viz., that if the "amount actually paid is found to be insufficient to satisfy the claims of the creditors," each

stockholder holding stock for which he has not paid "shall be bound to pay on each share held by him the sum necessary to complete the amount of such share or such proportion of that sum as shall be necessary to satisfy the debts of the company."

It seems to me that this statute is a simple expression of the rule of the common law that the unpaid subscriptions to the capital stock of a corporation form an asset for the payment of the debts thereof, and, as we shall see further on, in equity, at least, one who receives stock as full paid, without paying for it, occupies the position of a subscriber to stock who has not paid his subscription.

It may be argued that each mill owner was apprised, by the option which he signed, that the corporation was to be capitalized at $4,000,000 in stock, subject to $1,000,000 in bonds secured by a mortgage, precisely as it was, and hence that there was no fraud practiced upon the mill owners in their capacity as future stockholders in the company. But granting that each mill owner assented to the formation of such a corporation, and to take stock therein for two-thirds of the value of his mill, yet such assent by no means warranted the issue of stock, without the actual payment of cash for it, to an extent beyond what was necessary to pay for the mills to be actually purchased, and to pay for the reasonable cost of the consolidation to be effected thereby. It cannot be construed into a license to Mr. Stein and his associates to divide among themselves as full paid all the stock mentioned in the options without giving compensation therefor. In other words, the natural and business-like construction to be put upon the affair was that any stock not needed for the purposes just mentioned should lie in the treasury, to use the language indulged in to describe such stock, and to be issued only for cash or other property.

I might rest the case here, but complainant contends that it does not stop here, and that Stein and his associates failed to complete and carry out the contract entered into by him in that he did not convey, at his own expense, to the company all the property which, by his proposition accepted by the resolution of December 14th, 1892, he agreed to convey.

I shall now consider that part of the case, and in that connec-

tion some of the details of the proof that Stein was acting for himself and his two associates, Beard and Untermeyer.

[Discussion of evidence omitted by direction of the vice-chancellor.]

But, grant that Mr. Untermeyer's position was what he claims it to have been, I am unable to see how it affects the question of his liability in this case. If he was not a joint partner in the enterprise and not, strictly speaking, therefore bound as an individual under the authorities, to inform the directors of the cost of the thirty-nine mills, he was still the counsel of Messrs. Stein and Beard and devised the scheme from beginning to end, and supervised its conduct, and was therefore thoroughly familiar with all its details, and accepted divers issues of capital stock for himself and members of his firm as bonus with bonds, with a full knowledge of the whole affair and without paying one cent for them. Hence, the question just discussed becomes a purely academic one, turning in part upon the meaning, in this connection, of the mere colloquial word "promoter."

The controlling question, which must not and cannot be obscured by the ingenious and refined reasoning about questions which do not, after all, throw any light upon it, is, did he and his friends accept from the company certificates for shares of stock for which they have not paid? And, after all, the question is not, as before observed, whether Untermeyer, Beard and Stein were promoters in the sense as would render them liable for any profit that any of them made, as whether they are liable under the statute to pay to the creditors of the company the amount of the stock issued to them and not paid for.

It should be noticed here that the liability of the defendants is not diminished by the fact that no one of them made an actual subscription to the stock which he received. That formality is of no materiality unless the action be brought at law by the company based upon an express contract. In equity, and as against creditors, the acceptance of the stock, without paying for it, places the acceptor in the position of a subscriber. This was expressly decided in *Richardson* v. *Green, 133 U. S. 30* (at *pp. 43* and *45*) *et seq.,* and this holding was expressly approved by the supreme court of the United States in *Clark* v. *Beaver,*

*139 U. S. 96* (at *pp. 112* and *113*). In *Handley* v. *Stulz, 139 U. S. 417* (at *p. 426*), decided at the same term as *Clark* v. *Beaver, supra,* we have this language, uttered by Mr. Justice Brown, which is apt to the present point, and to another point set up by the defendants to be dealt with further on:

"With regard to the first class, namely, the original stockholders, who voted for this increase of eight hundred shares, and then distributed among themselves three hundred of those shares, without the shadow of right or consideration, it is difficult to see why they should not be called upon to respond for their value. The only claim made upon their behalf is that they never agreed to contribute or pay for the same; that the stock was expressly declared to be 'fully paid' and 'free from all claims or demands upon the part of the company'; that there was no evidence that the creditors of the company knew of or relied upon this increase in their dealings with the company, and that they had a right to return and surrender the same, which they offered to do. There is no reason to suppose that these stockholders did not act in good faith and in the belief that they were entitled to this stock. *The fact that they did not subscribe for it or agree to take it until the receipt of the certificates, is immaterial, as the acceptance of the certificates is sufficient evidence of an agreement to pay their par value."* (Citing authorities.)

"It has been the settled doctrine of this court that the capital stock of an insolvent corporation is a trust fund for the payment of its debts; that the law implies a promise by the original subscribers of stock who did not pay for it in money or other property to pay for the same when called upon by creditors, *and that a contract between themselves and the corporation, that the stock shall be treated as fully paid and non-assessable, or otherwise limiting their liability therefor, is void as against creditors."*

Another point made by defendants is that this court has no jurisdiction to enforce this claim, and, incidentally, that the several judgment creditors have not recovered any judgments in this state and had executions returned *"nulla bona."*

With regard to this last point, it has no foundation in our

statute, nor in what may be called the common law applicable to the present case.

The jurisdiction and power of the court seem to me to have been determined by the court of errors and appeals in this very cause. Since, upon a comparison of the original bill, there under review, and the amended bill, under which we are now proceeding, I find no such difference in the frame and prayers of the two bills as affects this question.

But the entire line of authorities is clear upon this subject.

No question has ever been raised but that the receiver of an insolvent corporation in this state has always, by his appointment, been vested *instanter* with all the rights and property of the corporation, and that he is in truth and fact receiver both for the stockholders and creditors, and in a great majority of cases practically of the creditors only.

It has always been the practice of this court—*first,* to ascertain the whole amount of the unpaid debts; *second,* in case of unpaid stock subscriptions or stock issued without payment, to determine the names of such stockholders and the amount due from each; and *third,* to make an assessment against those stockholders, which, in case an action at law is brought, based upon that assessment, is conclusive against the stockholders.

The authorities on that question are numerous.

Their examination shows that the only question is whether the final remedy for the collection of the assessment is in law or in equity.

In *Hood* v. *McNaughton, 54 N. J. Law (25 Vr.) 425,* an assessment had been made by the chancellor upon the stockholders, and his authority to do so was recognized by the supreme court and enforced in an action at law.

In *Barkalow* v. *Totten, 53 N. J. Eq. (8 Dick.) 573,* Vice-Chancellor Emery held that in the case before him, after this court had made an order directing the receiver to collect ordinary unpaid subscriptions of capital stock, the remedy was at law, based on the order of the chancellor, and not in equity.

Whether that decision applies to the present case, the circumstances of which are quite different, I shall consider in a moment.

But the power and duty of this court in the premises is distinctly upheld by the court of errors and appeals in *Cumberland Lumber Co.* v. *Clinton Hill Lumber Manufacturing Co., 57 N. J. Eq. (12 Dick.) 627*, where it was distinctly declared that it was the province of this court to determine the amount necessary to be raised and to distribute the same among the stockholders liable, and that when such determination and assessment has been made by this court it is binding upon the stockholders, and that its action in that behalf was judicial, and therefore must be conducted according to the fundamental principles of justice, and reasonable notice be given to the parties to be affected thereby.

Now let us apply those principles to the case in hand.

In the first place, it is abundantly proven that there are no assets, either in this state or anywhere else, within reach of the receiver herein, which can be applied to the payment of its debts. It is admitted by the answers that there are no assets in this state, and it clearly appears by the proceedings in foreclosure in the western federal courts that there are no assets there. And I venture to suggest that it is the duty of the defendants to point them out, if any there be.

In the next place, the debts which have been proven have been duly passed upon by the receiver, acting in his judicial capacity, and actual notice given to the defendants and opportunity given to them to dispute the same, which they embraced, and filed exceptions to several of them, which exceptions were heard and dealt with by the court in due course of justice.

Notice by mail was given of all these proceedings to defendants living out of the state and who had not appeared or been served with process, so that it is highly probable, if not certain, under the authorities, that all the defendants are bound by the ascertainment of those debts.

In the next place, the defendants who have appeared and answered were, I believe, all, or nearly all, originally served with process, but whether all or not is immaterial. They have submitted themselves to the jurisdiction of the court and have here litigated the question of their liability, which rested on

6

circumstances and considerations peculiarly fit for the determination of this court. They are quite in contrast with an ordinary subscription to capital stock, such as was dealt with in *Barkalow* v. *Totten,* *53 N. J. Eq.* (*8 Dick.*) *573.*

In an action at law the complainant would find himself confronted with the certificate of stock, apparently issued with due formality, declaring on its face that it was full paid and unassessable. No action could be maintained in the face of that contract under seal until it was disposed of and annulled.

Whether that could be done in a court of law may well be doubted. It is enough to say that it is clearly the province of a court of equity to relieve the complainant under those circumstances.

It is therefore, in my judgment, eminently the province and the duty of this court to ascertain, declare and decree the liability of the several defendants who have been brought within the jurisdiction of the court.

In my judgment, it is further within the power, and it is the duty of the court, having proceeded thus far, to declare the individual liability of each stockholder within its jurisdiction, and the amount necessary to be paid by him in order to satisfy the amount found due to the creditors, and to make use of its ordinary processes to enforce the payment of that sum.

Supposing that all the defendants were residents of New Jersey, I see no reason for the court staying its hand and directing an action at law against each one of these stockholders, since every defence which they could have at law has already been set up by them and dealt with by this court, and, besides, in the enforcement of its decrees, many questions may arise which only this court can determine.

But this question has little practical value in this case, since all of the defendants but two or three are, I believe, non-residents, and resort must be had to a foreign court to enforce the decree of this court.

This brings us to that part of the case which is not covered by direct authority, and must be settled according to the general rules of practice of the court applicable to such cases.

· The defendants assert that if they are liable it follows that many of those defendants who have not been brought within the jurisdiction of the court are also liable, and that it is unfair to defendants that the whole burden should be cast upon their shoulders.

This proposition is entirely sound. But it must not be so applied and enforced as to work injustice to the creditors.

As I understand the law, those creditors have no other remedy except that which they have pursued, and this court has no jurisdiction in this behalf to render a binding decree of liability against stockholders who have not been brought within the jurisdiction of the court and have not appeared. This is the misfortune of those who have appeared. It is not the fault of the creditors that the business of the corporation was carried on outside of the territorial limits of the State of New Jersey.

The administration of the equities in this case is somewhat analogous to a contribution by several joint guarantors.

It is quite clear that, in such cases, if one of several guarantors is dead, or insolvent, or beyond seas, those who are solvent and within reach of the process of the court must bear the whole burden.

In the present case the three parties primarily liable were Beard, Stein and Untermeyer. Beard is dead, insolvent, and Stein is living, insolvent, and beyond the jurisdiction of this court. This throws the responsibility on Mr. Untermeyer alone, unless some of those who took their stock from either Stein or Beard can be held liable because they took such stock with notice that it had not been paid in full. That question I shall deal with further on. I mention it here simply to show how the general principles of equity jurisprudence apply to the present case.

The stockholders who accepted their stock without paying for it knew that the stock was to be widely distributed in different states of the union, and hence they must have known that in case of disaster the remedy of creditors was just that, and only that, which has here been set in motion. After all, the defendants here involved cannot complain if they are obliged to pay no more than they ought to have paid in the first place.

Still I think it is the duty of this court to relieve them, so far as it can, by enabling them to have such use of its officers and the proceedings of this court as they shall be advised will enable them to recover against absent stockholders who are, or may prove to be, equally liable with them, such a share of the amount they shall have paid as will be just and equitable. I shall hear counsel as to the form, extent and terms of a provision, for that purpose, to be inserted in the decree.

Another defence set up by defendants is, that it does not appear that the creditors, or any of them in this case, relied upon the fact that the amount of capital stock, $4,000,000 over and above the mortgage, had been paid in.

I am unable to see the least force in this defence. It has not the least foundation in our statute nor in any decision or dictum of any court in this state.

The scheme of our legislative policy in that respect· is that all creditors shall stand on an even footing.

Besides, here not only does the certificate of organization declare that the capital shall be $4,000,000, but five months later, in May, 1893, the officers of the corporation, as before stated, filed the statutory certificate in the secretary of state's office declaring that all the capital had been paid in.

These records are public records and are made so for the benefit of the public, and particularly for the information of creditors, and the filing of the certificates was required by section 30 of the act of 1875, in force when the corporation was organized (*Rev. 1877 p.. 182*), as amended by the act of March 21st, 1893 (*P. L. 1893 p. 444. Gen. Stat. 965*).

The true rule, in my judgment, is, that in the absence of any proof on the subject, which is the case here, the creditors are presumed to have acted upon the information of these records.

It was accordingly held by the supreme court of the United States, in the case of *Handley* v. *Stutz, 139 U. S. 417,* that where a corporation of Kentucky, long after it had been carrying on business, issued additional shares of stock to its stockholders without payment therefor, such stockholders were liable for the

amount of that stock to all creditors who became such after the issue of the stock. See fourth headnote, and see citation from the opinion in that case, *supra,* where Justice Brown says that the defence was set up, that "there was no evidence that the creditors knew of or relied upon this increase of stock in their dealings with the company."

The single authority (*First National Bank* v. *Gustin Mining Co., 42 Minn. 327*), cited by counsel of defendants in support of their contention, does not bear them out.

The next defence set up by the defendants is set-off.

They produce in court and prove and claim a right to set off a large batch of the bonds of the company.

This claim is inadmissible, both upon principle and authority.

This is a suit by a receiver in behalf of all the creditors who have proved their claims, and have been allowed by the receiver, to be paid out of the assets of the corporation.

Its basis is an equal distribution of those assets among the creditors, and the payments due on unpaid stock subscriptions or holdings constitute a part of that fund.

This was so distinctly held by Chancellor McGill in the case hereinbefore cited of *Hebberd* v. *Southwestern L. & C. Co., 55 N. J. Eq. (10 Dick.) 18* (at *p. 31*), and also in *Burgel* v. *Robinson, 51 C. C. A. 488; 113 Fed. Rep. 669 (1902*).

The defendants had full opportunity to prove their claims on these bonds before the receiver, and voluntarily, as I must assume, failed to do so. Their remedy in that respect is lost by the decree barring creditors, unless the court, for good cause shown, should see fit to open the decree to let them in.

But if this remedy were granted the result, as clearly shown in complainant's argument, would be substantially the same. The amount of the debts would be increased and the percentage each defendant would be called upon to pay would be increased proportionately. Further, it was also shown by complainant's argument that if the set-off were allowed, there must be deducted from each bond, for which bonus stock was issued, sixty per centum thereof due by reason of the unpaid stock received as a bonus thereon.

The cases cited and relied upon by defendants in favor of a right to set off their bonds in this case are not in point. They were suits by a single creditor against a single stockholder based upon a statutory provision warranting such a suit under certain circumstances, and were not suits for the benefit of all creditors. The courts held that if the defendant stockholder was also a creditor of the corporation he was as much entitled to be paid as was the plaintiff in the suit.

I believe that I have now disposed of all the distinct defences set up which are applicable to all the defendants.

It follows, of course, that I hold as unpaid the three hundred and odd shares of preferred stock issued to Mr. Samuel Untermeyer in January, 1893, also the large number of shares of the common stock, two thousand in number, of the same date. There may be others of the common stock justly chargeable to Mr. Samuel Untermeyer. I do not for present purposes expect to be precise. Some or all of these shares were promptly divided by Mr. Untermeyer with his partners according to the interest which each one had in the profits of the business.

I hold Mr. Samuel Untermeyer and his partners severally primarily liable on each share of the stock so finally located in each of them.

I hold them primarily liable on the distinct ground that if these shares were originally issued to Stein, and by him transferred to Untermeyer, such issue and transfer was a mere shell without substance.

I also hold all shares issued as a bonus for bonds paid for to be so issued without payment, and I hold Mr. Samuel Untermeyer liable for each share issued to him for the purpose of being distributed to bondholders, if any such were so issued, over and above those already mentioned. I have not taken the trouble to examine the transfers in detail to cover this point with precision.

I hold, as secondarily liable on all the shares issued as a bonus for bonds, such of the defendants as took them with notice that they had not been paid for in cash or its equivalent in property at a fair valuation.

I believe that all of the defendants, who are charged because they hold bonus stock, subscribed for and in most cases paid for their bonds before the company was organized, and that they came in, so to speak, "on the ground floor," and were getting what, in substance, was an original issue of bonds and stock, and therefore do not and cannot occupy the position of a person who goes into the open market and purchases bonds and stock of a company organized for a considerable period of time prior to such purchase, and whose bonds and stock have become matter of daily merchandise.

I hold, further, that the fact that they were receiving for $1,000 in cash a mortgage bond for $1,000 and a bonus of $600 of stock of a company in process of formation, was sufficient, of itself, to show them, or at least to put them on inquiry, that the stock so issued had not been paid for either in cash or in its equivalent in property.

This holding, of course, also includes Mr. Heppenheimer, and also, I am sorry to say, Mr. Hall, who purchased his bonds and received therewith a stock bonus from Mr. Beard, who is now dead and insolvent.

It is quite plain, from the reading of his evidence, that he was aware, as were the other defendants, that he was "coming in on the ground floor" of a corporation about to be formed.

The same applies to Mr. Spencer, the client of Mr. Wall, but he will have a recourse over to Mr. Untermeyer.

The estate of Otto Huber, represented by Mr. Corbin, comes in the same category with Mr. Spencer.

Each of these defendants (except Mr. Hall) whom I hold secondarily liable will be entitled to be subrogated to the rights of the complainant under his decree against Mr. Untermeyer.

In ascertaining the number of shares of stock among which the liability is to be divided, there will be added to the whole number of shares issued to Mr. Untermeyer and his law partners the number issued to Mr. Hall, and all the shares held by the defendants held secondarily liable, except Hall, will not be counted. To the total amount in dollars of the shares, the holders of which are held primarily liable, will be added interest

from January 1st, 1893, which sum will be the limit of the total liability of the defendants now being dealt with.

In order to ascertain the whole amount of money necessary to be raised the receiver will compute the amount due on the several claims allowed by him and approved by this court by adding interest on each claim. To the sum of those will be added, first, the cost of the solicitors for the creditors, both in the proceeding to wind up the corporation and in this court, and to that will be added a reasonable counsel fee to complainant, to be fixed by the court on motion for that purpose; next, a round sum to cover the receiver's compensation and any further expenses which he may incur in the enforcement of this decree against the defendants held liable hereby.

This last sum, of course, will be liable to a reduction, according to the conduct of the defendants in resisting its enforcement.

The decree will be prepared by counsel for complainant, copies served on the counsel for defendants, and the differences between them will be settled on notice.

It will also contain a special clause reserving leave to all or any of the defendants, when they shall have paid the amount hereby decreed against them severally, to apply to this court for leave to make use of its proceedings and decrees, both in the winding up cause and in this cause, to obtain relief against those stockholders who have not been served with process within the jurisdiction of this court, and who have not appeared in this suit, upon such terms as this court may deem proper.